# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **LATRAY WHITLEY,** | § | |
| **TDCJ No. 01894470,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **Civil No. SA-19-CA-0618-XR** |
| | § | |
| **BOBBY LUMPKIN,[1] Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Petitioner Latray Whitley's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 2), Petitioner's Memorandum in Support (ECF No. 13), and Respondent Bobby Lumpkin's Answer (ECF No. 22). Having reviewed the record and pleadings submitted by both parties, the Court concludes Petitioner is not entitled to relief under the standards prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2254(d). Petitioner is also denied a certificate of appealability.

## I. Background

The facts of Petitioner's case were accurately summarized by the Texas Fourth Court of Appeals on direct appeal (in pertinent part):

> In the early morning hours of November 8, 2009, Corey Cumby was shot and killed while he drove his car down an interstate in San Antonio, Texas. Cumby was a member of a gang called the East Terrace Gangsters. [Petitioner] is a member of a rival gang, the Wheatley Court Gangsters. The night of November 8, 2009, Cumby had been at Club Studio, a nightclub in northeast San Antonio.

---

[1]     The previous named Respondent in this action was Lorie Davis. On August 10, 2020, Bobby Lumpkin succeeded Davis as Director of the Texas Department of Criminal Justice, Correctional Institutions Division. Under Rule 25(d) of the Federal Rules of Civil Procedure, Lumpkin is automatically substituted as a party.

He left the club alone, and as he waited behind a car in the left lane at a light near Loop 410, another car pulled alongside him in the right lane.  When the light turned green, Cumby's car, the one alongside him, and the one behind him raced to Loop 410 and then to Interstate 35.  The rear window on the driver's side of the car that had been alongside Cumby lowered, and several gunshots were fired at Cumby's car.  Cumby's car exited the freeway and came to rest in a ditch off Interstate 35.  A witness, Melissa Covarrubia, went to Cumby's car and found Cumby unresponsive.  The medical examiner testified that the cause of Cumby's death was a gunshot wound and that the gun was not fired at a close distance.

At trial, thirty-five-year-old Alvin Clark testified that on November 8, 2009, he was at [the] club.  . . .  As Clark left the club, he saw Cumby get into his car.  Clark got into his own car and drove south on Perrin Beitel towards Loop 410.  According to Clark, . . . he heard shots and . . . testified that [Petitioner] was the one who was shooting at his and Cumby's cars.  Clark heard eight shots.  According to Clark, after the shooting, the car Peanut [Hollis Neally, Petitioner's brother] was driving "flew" past him.  The car then dropped back to Clark's car.  Clark "took off" and heard another shot.  He noticed that fire was coming out of the passenger's side in the back of his car.  Clark testified that he did not see what happened to Cumby. A bullet hole pierced Clark's car.  . . .

Clark admitted that he has been convicted of being a felon in possession of a firearm.  He testified that he was currently under federal supervision for possession with intent to deliver cocaine.  He testified that he did not have an agreement with the State to testify.  . . .  On cross-examination, . . . [w]hen the defense asked Clark whether he had a "Rule 35" agreement with the Federal Bureau of Prisons, Clark testified that he did not.

Clark's former wife, Latoya Clark, testified that on the night Cumby was killed, she received a phone call from Clark.  According to Latoya, Clark was scared and was yelling that he was being shot at on I–35.  The next morning, Latoya learned that Cumby had died.  According to Latoya, Clark told her that he thought [Petitioner] had shot at him.  Latoya testified that Clark had been driving her car the night Cumby was killed and that there was a bullet hole in it the day after the shooting that had not been there before.  . . .

Twenty-nine-year-old Donald Grinage testified that on November 8, 2009, he was at Club Studio and saw Cumby at the club.  According to Grinage, he did not see any heated arguments or any problems in the club. After leaving the club, he was stopped at a light at the intersection of Loop 410 and Perrin Beitel when he noticed Cumby's car in front of his car.  To the right of Cumby's car was a black car with three people in it.  Grinage testified that "[w]hen the light turned green, all the cars took off fast, got on the highway."  When Grinage got onto the highway, he saw a hand come out the little black car shooting at Corey [Cumby]'s car."  Grinage saw Cumby's car exit the freeway.  He tried to catch up to the black car but was never able to do so.  . . .

Reginald Earl Green, Jr. testified that he and [Petitioner] had gotten to know each other when they were both incarcerated at "GEO," a federal holding facility.  According to Green, [Petitioner] told him that on the night Cumby was killed, [Petitioner] received a call directing him to come to Club Studio.  He and his brothers drove a rental car to Club Studio to see "East Terrace gang members."  [Petitioner] said that he had been upset with Cumby, who was from a rival gang, because Cumby had bought "some rims" from [Petitioner]'s brother with counterfeit money. . . .

According to Green, [Petitioner] said that he and his brothers were "just going to follow them."  "The hit wasn't supposed to happen on the highway."  "It just so happened when they got on the highway, the opportunity presented itself because wasn't nobody [sic] on the highway but them [sic] cars."  [Petitioner] pulled up alongside Clark, and Clark accelerated faster.  Then, Cumby accelerated so that [Petitioner]'s car was beside Cumby's car.  [Petitioner], who was sitting in the back seat behind the driver, stuck his gun out of the window and shot five or six times.  According to Green, [Petitioner] said that after he shot Cumby, "he shot a couple of times at [Clark]."  . . .

*Whitley v. State*, No. 04-13-00314-CR, 2014 WL 3611592, at *1–4 (Tex. App.─San Antonio, July 23, 2014, no pet.); (ECF No. 18-2 at 2-5).

After hearing all of the evidence, a Bexar County jury found Petitioner guilty of the murder of Corey Cumby and sentenced him to life imprisonment.  *State v. Whitley*, No. 2012-CR-7038A (186th Dist. Ct., Bexar Cnty., Tex. May 10, 2013) (ECF No. 18-4 at 94-95).  Petitioner appealed to the Texas Fourth Court of Appeals which affirmed the conviction in an unpublished opinion.  *Whitley*, 2014 WL 3611592.  Petitioner did not file a petition for discretionary review with the Texas Court of Criminal Appeals (TCCA).

Instead, Petitioner challenged the constitutionality of his state court conviction by filing a state habeas corpus application and, with the help of counsel, filed several amended applications and supplemental memorandums.  *Ex parte Whitley*, No. 78,721-02 (Tex. Crim. App.); (ECF

Nos. 18-21 through 18-25, 18-37 through 19-22).[2]   After holding a four-day evidentiary hearing, the state habeas trial court entered an order containing detailed findings of fact and conclusions of law recommending the denial of habeas relief.  (ECF Nos. 20-98 through 20-105).  Based on these findings, the TCCA denied Petitioner's state habeas application without written order on June 5, 2019.  (ECF No. 18-19).

The next day, Petitioner initiated the instant proceedings.  (ECF No. 2).  In the petition and lengthy memorandum in support (ECF No. 13), Petitioner raises the same allegations that were rejected by the TCCA during his state habeas proceedings.  Specifically, Petitioner claims (1) the State made misleading representations and failed to correct materially false testimony given by two state witnesses, Alvin Clark and Reginald Green, (2) the State withheld impeachment evidence in the form of Clark and Green's federal cooperation agreements, (3) the State withheld impeachment evidence in the form of recorded conversations between police and the lawyers for Clark and Green, (4) trial counsel rendered ineffective assistance by failing to request a jury instruction pursuant to Texas Code of Criminal Procedure Article 38.075(a), and (5) trial counsel rendered ineffective assistance by failing to insist on the disclosure of Clark and Green's federal cooperation agreements.

## II.  Standard of Review

Petitioner's federal habeas petition is governed by the heightened standard of review provided by the AEDPA.  28 U.S.C.A. § 2254.  Under § 2254(d), a petitioner may not obtain federal habeas corpus relief on any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as

---

[2]      For some unknown reason, Respondent submitted the 2,500-page record for Petitioner's state habeas proceeding in 264 separate docket entries, with each docket entry only containing somewhere between 3-10 pages. *See* ECF Nos. 18-18 through 20-105.

4

determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005). This intentionally difficult standard stops just short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120 (2010); *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable, regardless of whether the federal habeas court would have reached a different conclusion itself. *Richter*, 562 U.S. at 102. Instead, a petitioner must show that the decision was objectively unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).

So long as "fairminded jurists could disagree" on the correctness of the state court's decision, a state court's determination that a claim lacks merit precludes federal habeas relief. *Richter*, 562 U.S. at 101 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In other words, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, Petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103; *see also Bobby v. Dixon*, 565 U.S. 23, 24 (2011).

### III. <u>Analysis</u>

**A.** <u>**The False-Testimony Claim**</u> **(Claim 1).**

Petitioner first claims that the State's misleading representations and failure to correct materially false testimony from two of its principle witnesses violated his Due Process rights under *Napue v. Illinois*, 360 U.S. 264 (1959).  Specifically, Petitioner contends the State (1) made written and oral misrepresentations at trial regarding the nature of cooperation agreements between the federal government and State witnesses Alvin Clark and Reginald Green, and (2) failed to correct testimony by Clark and Green denying the existence of such agreements.  (ECF No. 13 at 137-82).  These allegations were rejected by the TCCA during Petitioner's state habeas proceedings.  As discussed below, Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, federal law, or that it was an unreasonable determination of the facts based on the evidence in the record.

#### 1. <u>Relevant Background</u>

Prior to Petitioner's trial, the State filed a Response to Defendant's Request for Agreements with Witnesses, explicitly stating "[t]he State has made no agreements with witnesses in exchange for testimony."  (ECF No. 18-4 at 83-84).  In the Response, the State informed Petitioner that witness Reginald Green had entered a sealed plea agreement in federal case SA-09-CR-772(2)-OLG and that "no information related to the present case was included as the basis for the United States Government's recommendation regarding his sentence."  *Id*.  The State also informed Petitioner that witness Alvin Clark entered a sealed plea agreement in his federal case styled SA-10-CR-865(1)-HLH.  *Id*.  Clark's plea agreement included language that he must cooperate with the United States Government in all criminal transactions known to him, but also stated that "no future testimony regarding Clark's knowledge of the present case" was

the basis of the Government's sentencing recommendation.  *Id*.  The State concluded its Response by stating "there is no agreement between the State and the United States Government to reduce Green's or Clark's sentences based on testimony in the present case."  *Id*.

The State essentially repeated these assertions at a pretrial hearing on whether Clark and Green had agreements with the State and/or federal government to testify favorably in the instant case.  (ECF No. 18-8 at 9-16).  Thereafter, both Clark and Green testified for the State at Petitioner's trial.  During cross-examination, counsel for Petitioner, Juan Aguilera, attempted to impeach Clark with the federal plea agreement, asking Clark whether he had a "Rule 35 agreement."[3]  *Id*. at 93-94.  Clark responded that he did not have such an agreement.  *Id*.  Outside the presence of the jury, Green also stated he did not have a Rule 35 agreement.  (ECF No. 18-9 at 53).  Later, during closing arguments, the State reiterated that its "star witnesses"—Clark and Green—had no agreements to testify, but rather testified because they were subpoenaed.  (ECF No. 18-10 at 16-17).

Petitioner now claims that both Clark and Green brokered an agreement with the State to testify at Petitioner's prosecution in exchange for the State writing a favorable recommendation to the federal prosecutor, David Shearer, for a reduction in their respective federal sentences.  As evidence of these agreements, Petitioner points to the fact that Clark, over a year prior to testifying at Petitioner's trial, received a reduction in his federal sentence from 70 months to 30 months as a result of providing beneficial information about Cumby's murder to the police, while Green's federal term of supervised release was terminated several months after Petitioner's trial as a reward for his testimony.  Although the State had copies of the witnesses' federal plea

---

[3]      A "Rule 35 agreement" refers to Rule 35 of the Federal Rules of Criminal Procedure, which provides a mechanism for reducing the sentence of a federal inmate who demonstrates exemplary behavior following incarceration.  In relevant part, Rule 35 allows the federal government, at its discretion, to move the sentencing court to lower a previously imposed sentence if the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person.

agreements, Petitioner contends the State withheld the agreements and instead drafted the Response to Defendant's Request for Agreements with Witnesses that misrepresented the contents of the agreements. Petitioner also claims the State failed to correct false testimony given by Clark and Green denying the existence of any Rule 35 agreements.

2.    The *Napue* Standard

Under *Napue*, a criminal defendant is denied due process when the State knowingly uses perjured testimony or allows false testimony to go uncorrected at trial. 360 U.S. at 269; *see also Giglio v. United States*, 405 U.S. 150 (1972). A petitioner seeking to obtain relief on such a claim must show that (1) the testimony is false, (2) the prosecution knew that the testimony was false, and (3) the testimony was material. *United States v. Dvorin*, 817 F.3d 438, 451-52 (5th Cir. 2016); *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007). False testimony is only material if there was a reasonable likelihood that it affected the jury's verdict. *Giglio*, 405 U.S. at 153-54; *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000).

3.    Analysis Under the AEDPA

Petitioner raised these *Napue/Giglio* allegations during his state habeas proceedings. The state habeas trial court held hearings on Petitioner's habeas application in 2017, where it heard testimony from (1) Assistant U.S. Attorney David Shearer, (2) Petitioner's trial counsel, Juan Aguilera, (3) Clark Adams, Reginald Green's federal attorney, (4) Scott McCrum, Alvin Clark's federal attorney, and (5) Tanner Neidhardt, the Assistant District Attorney who prosecuted Petitioner in the instant case. The state court then issued a lengthy order summarizing the testimony of each witness and making detailed findings of fact and conclusions of law recommending the denial of habeas relief. Regarding Petitioner's *Napue/Giglio* allegations, the

court concluded that Petitioner failed to establish that Clark's and Green's testimonies were

actually false:

     5.      With regard to whether Clark's testimony was false,

        a)      There is no evidence that Clark testified favorably for the State based on having already received a reduced sentence on his federal offense.

        b)      There is no evidence that Clark testified favorably for the State based on an expectation that he would receive a reduction in his federal sentence.

        c)      There is no evidence that Clark received any benefit after he testified in [Petitioner]'s trial.

        d)      Clark gave state authorities information in 2011 regarding Cumby's murder that helped the prosecution in this case.

        e)      Clark received a benefit on his federal sentence for giving this information to the state.

        f)      This occurred over a year before [Petitioner]'s trial.  There is nothing to support a claim that Clark's reduced federal sentence was somehow contingent upon him testifying in [Petitioner]'s trial.

        g)      [Petitioner] does not suggest that Clark's federal sentence reduction would be in jeopardy if he did not testify favorably for the State in this case.

        h)      Furthermore, [Petitioner] has not shown that the information Clark gave to authorities in 2011 was going to have any *further* benefit if he testified in [Petitioner]' trial.  And, in fact, Clark received no additional benefit for testifying.

        i)      [Petitioner] is conflating the benefit Clark already received with a motive to testify in exchange for a future benefit.  But there is no evidence of any promise or understanding with Clark that he was going to further benefit his federal sentence by testifying in this case.

        j)      During trial, Clark testified that he was currently under federal supervision for possession with intent to deliver cocaine.  When asked if he had any agreement "with the State" or "with the D.A.'s

office to testify," he replied, "No."  He showed up because he "got subpoenaed."

6.      With regard to whether Green's testimony was false,

      a)      Green testified at trial that he, too, had been to federal prison, and that he is currently on federal probation for a possession with intent to deliver cocaine.  He also admitted that he had an aiding in a bank fraud federal case, and other state cases.

      b)      Green testified that he did not want to come testify in this case; that it "wasn't beneficial" for him, and that he "ain't made up nothing."

      c)      Even though Green did in fact receive a reduction in his federal sentence as a result of his cooperative testimony in this case, there is no evidence that there was *a prior agreement*, or even a prior understanding *with the State prosecutors*, that his testimony was in exchange for such favorable treatment of his federal case.  In fact, Tanner Neidhardt stated that he believed that Green did not expect to receive any benefit from testifying.

7.      The court finds that Clark's testimony—that he did not have an agreement with the State that would impeach his credibility as a witness—was not false.

8.      The court finds that Green's testimony—that he did not have an agreement with the State that would impeach his credibility as a witness—was not false.

9.      The court finds that there was no agreement between Clark and the State, or between Green and the State, to testify favorably in this case in order to gain a benefit in their federal case.

(ECF No. 20-102 at 2-4).

The court also concluded that Petitioner failed to establish *Napue*'s materiality prong:

10.      [Petitioner] has not shown that he would not have been convicted of Cumby's murder if Clark and Green had been impeached with questions related to their federal plea bargains.

11.      As the trial record clearly indicates, the jury was aware that both Clark and Green had federal convictions. There is nothing persuasive in the record to suggest that, had the jury known that Green and Clark had already received reductions in their federal sentences because of having provided

information in 2011 to state detectives regarding this case, the jury would have viewed Clark's and Green's testimony differently.  There is nothing persuasive in the record to suggest that, had defense counsel been able to question these witnesses about the general terms of Clark's and Green's federal plea bargains, that would have affected how the jury weighed their testimony, particularly since there was no reference in either plea bargain to this case.

12.   The trial court finds that the evidence reflecting that Green received favorable treatment in his federal case after he testified at [Petitioner]'s trial, viewed in light of the totality of the record, fails to demonstrate by a preponderance of the evidence that either Clark's or Green's testimony gave the jury a false impression.  [citing *Ex parte Ghahremani*, 332 S.W.3d 446, 477 (Tex. Crim. App. 2011)].

*Id*. at 4.  The TCCA then adopted the trial court's findings when it denied relief without written order.  (ECF No. 18-19).

Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of *Napue* or that it was an unreasonable determination of the facts based on the evidence in the record.  A state court's determination is entitled to great deference when, as was done in this case, the court conducted a thorough and thoughtful review of the evidence.  *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993).  Here, the state court entered lengthy findings and conclusions after conducting an extensive hearing on Petitioner's allegations.  Petitioner has not shown that the state court's denial of his *Napue* allegation "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 562 U.S. at 103.

Moreover, this Court has independently reviewed the record of these proceedings and finds no affirmative evidence establishing that Clark and Green testified falsely, much less that the false testimony affected the jury's verdict.  Although Petitioner contends the State withheld and misrepresented the contents of Clark's and Green's federal plea agreements, the only allegedly false testimony for purposes of *Napue* came from Clark and Green themselves when

11

they testified they did not have Rule 35 agreements in exchange for their testimonies.  However, the jury was already aware that both Clark and Green had extensive records and federal convictions and heard counsel's attempts to impeach the witnesses' credibility during opening statements and on cross-examination regarding their motives to testify.  The jury also heard that neither witness wanted to testify in this case but showed up because they were subpoenaed.  Thus, even if Clark and Green did have cooperation agreements with the State or federal government to testify, it is unlikely this information would have changed the jury's perception of the witnesses' credibility one way or the other.

There is also nothing in the record to establish how information about the federal plea agreements signed by Clark and Green, if made available to the jury by the State or through further cross-examination by counsel, would have affected the persuasiveness of the witnesses' testimony.  While Petitioner contends a potential reduction in sentence is a powerful incentive for the witnesses to testify falsely for the prosecution, the plea agreements signed by Clark and Green well over a year before Petitioner's trial neither mentioned Petitioner's case directly nor contained a promise of reduction in exchange for their testimony.  *See* ECF No. 13-1 at 15-20 (addendum to Green's plea agreement), 70-75 (addendum to Clark's plea agreement).  Rather, the witnesses were informed that it was within the federal government's sole discretion to seek a sentence reduction and that, even if the government sought a reduction, the court was not obligated to grant one.  *Id.*  The plea agreements also obligated the witnesses "to tell the absolute truth" and not what they think "the Government wants to hear," and warned that "neither the United States nor the Court will sanction exaggerated or perjurious testimony." *Id.*

As a result, it is unlikely the jury would have viewed Clark's and Green's testimony differently had they been aware of the witnesses' federal plea agreements.  Indeed, there is too

little connecting the witnesses' federal cases to Petitioner's trial a year and a half later to have affected the jury's credibility determination.  This is particularly so given the other evidence in the record corroborating their testimony, including the testimonies of Donald Grinage and Lotoya Clark.  Consequently, there was no reasonable likelihood that the State's failure to correct the allegedly false testimony given by Clark and Green affected the jury's verdict. *Giglio*, 405 U.S. at 153-54.

Finally, Petitioner contends that the Fifth Circuit's opinion in *United States v. Dvorin*, 817 F.3d 438, 451-52 (5th Cir. 2016), should guide this Court's adjudication.  In *Dvorin*, the Fifth Circuit upheld a finding of *Giglio* and *Napue* violations based on the prosecution's failure to turn over a co-defendant's federal plea agreement supplement.  Petitioner contends *Dvorin* controls because of its resemblance to the instant case—both cases involve similar federal cooperation agreements, and, in both cases, the *Napue* violation stemmed from the prosecution's failure to divulge the agreements.  But Petitioner's reliance on *Dvorin* is misplaced for several reasons.

To start, the prosecuting entity that entered into the plea agreement with Dvorin's co-defendant—the federal government—was the same prosecuting entity who was prosecuting Dvorin.  In contrast, the State was in no way a party to the plea agreements entered into between the federal government and Clark and Green, and thus had no discretion to promise or seek a reduction in their federal sentences.  Further, unlike the co-defendant in *Dvorin*, neither Clark nor Green were involved in Petitioner's case as defendants or accomplices.  Rather, they were witnesses who had already been sentenced in their unrelated federal cases before Petitioner had even been arrested.  Lastly, unlike *Dvorin*, the federal government had not affirmatively agreed to file a motion urging a sentence reduction for Clark and/or Green in exchange for their

13

testimony in Petitioner's case.  Nor did the State make any promises—implied or explicit—to help Clark or Green in exchange for their testimony.  Thus, *Dvorin* is not controlling here. Relief is therefore denied.

**B.**     <u>**The Suppression Claims**</u> **(Claims 2, 3).**

Petitioner next contends that the State's failure to turn over Clark's and Green's federal plea agreements as impeachment evidence violated his Due Process rights under *Brady v. Maryland*, 373 U.S. 83 (1963).  (ECF No. 13 at 182-94).  Petitioner also asserts that the State withheld impeachment evidence in the form of recorded conversations between police and the lawyers for Clark and Green, Scott McCrum and Clark Adams.  However, these allegations were also rejected by the TCCA during Petitioner's state habeas proceedings.  Petitioner fails to show that this determination was either contrary to, or involved an unreasonable application of, federal law, or that it was an unreasonable determination of the facts based on the evidence in the record.

1.     The *Brady* Standard

It is well-established that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.  To establish a *Brady* violation, a petitioner must demonstrate that (1) the prosecution suppressed evidence, (2) that evidence was favorable to the defense, and (3) the evidence was material to either guilt or punishment.  *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Graves v. Cockrell*, 351 F.3d 143, 153-54 (5th Cir. 2003).  Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  *United States v. Bagley*, 473 U.S. 667, 684 (1985).  But the materiality of *Brady* evidence "depends almost entirely on the value of the evidence relative to

the other evidence mustered by the state." *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010)

(quoting *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004)).  "If the evidence provides

only incremental impeachment value, it does not rise to the level of *Brady* materiality." *Miller v.*

*Dretke*, 431 F.3d 241, 251 (5th Cir. 2005).

      2.   <u>Analysis Under the AEDPA</u>

Similar to his *Napue/Giglio* allegations, Petitioner first raised his *Brady* allegations

during his state habeas proceedings.   Following the state habeas trial court's extensive

evidentiary hearings, the court issued detailed findings of fact and conclusions of law

recommending the denial of habeas relief.  Regarding Petitioner's first *Brady* allegation, the

court made the following findings and conclusions:

> 20.    Clark and Green had already obtained a benefit on their federal sentences over a year before this trial for providing information to the State regarding this case.  There is no evidence suggesting that they would have further benefitted, or expected to further benefit, from testifying against Applicant *at trial*.

> 21.    Nevertheless, the trial court believes that the State, in an abundance of caution, should have provided the federal plea agreements and supplements to defense counsel.  It is disingenuous to maintain that they could not be considered as favorable to the defense.  While they do not constitute actual agreements between the State and the witnesses to testify in this trial, they do represent what could be interpreted as evidence of a possible motive to testify favorably for the State.  Defense counsel, if he'd been permitted, could have inquired further about the possibility that they could have sought further reduction of their federal sentences in exchange for their testimony.  Even though both witnesses denied such incentive to testify for the State, having the actual plea agreements to impeach the witnesses might have been helpful to the defense.

> 22.    But there is still no indication of how such line of questioning would have gone or how it would have affected the jury's decision, if at all.  And that leads to the third requirement to establish entitlement to a new trial based on a *Brady* violation—a defendant must demonstrate that the evidence is *material.*  Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Ex parte Adams*, 768 S.W.2d 281, 291 (Tex. Crim. App.

15

1989).    The materiality of withheld evidence must be considered cumulatively and not item by item.  *Turner v. United States*, 137 S. Ct. 1885 (2017).

23.    This court finds that [Petitioner] has not met the materiality requirement under *Brady*.  In this case, there was too much of a disconnect between the state trial against [Petitioner] and Green's and Clark's federal drug cases for which they had already been sentenced.  It is true that the defense could have asked additional questions in an attempt to impeach their credibility.  However, once their federal cases were revealed to the jury, and once they both denied having any agreements to testify in this case to better their federal cases, it is unlikely that any additional impeachment efforts would have *significantly* affected the persuasiveness of their testimony, particularly in light of the other facts presented by the State.

24.    Thus, under these facts, even if defense counsel had been furnished Clark's and Green's federal plea agreements and sealed supplements, this court finds that there is not a reasonable probability that the outcome of the trial would have been different.  Unlike in *Ex parte Temple*, No. WR-73,545-02, 2016 WL 6903758 *3 (Tex. Crim. App. November 23, 2016), in this case, the prosecutor's misconception regarding his duty under *Brady* was not "of enormous significance."

(ECF Nos. 20-103 at 5; 20-104 at 1).  And regarding Petitioner's second *Brady* allegation, the

court made the following findings and conclusions:

25.    [Petitioner] also alleges that the State failed to turn over the recorded conversations between federal lawyers for Clark and Green and SAPD regarding a possible deal in exchange for information about Cumby's murder.

a)    Alvin Clark's federal attorney, Scott McCrum, and Reginald Green's federal attorney, Clark Adams, contacted SAPD detectives by telephone in 2011 (two of the four recordings submitted as exhibits), stating that their clients had information about an unsolved murder, and they wanted to share this information with SAPD, in exchange for favorable treatment for their clients on their federal charges.

b)    On August 29, 2011, Detective McNelly met with Alvin Clark and Scott McCrum (recorded interview submitted as an exhibit).  In this recording, Alvin Clark's recitation of the facts are very similar to his testimony in [Petitioner]'s trial.

c)    On December 16, 2011, an SAPD detective met with Reginald Green and his federal attorney Clark Adams in a federal detention

facility in Florence, Colorado.   This interview is the fourth recording submitted as an exhibit.   In this recording, Reginald Green's recitation of how he learned of [Petitioner]'s involvement in the murder was very similar to his testimony at trial.

d)      These phone calls and interviews took place almost a year before [Petitioner] was indicted for the Cumby murder.

e)      As a result of Clark's cooperation in providing SAPD with information pertaining to [Petitioner]'s involvement in the Cumby murder, Clark's federal sentence was reduced.   This occurred before Clark testified in [Petitioner]'s trial.

26.     [Petitioner] must show that the undisclosed recordings are favorable to his case.   [Petitioner] has not demonstrated that the disclosure of the recordings would have made the difference between a conviction and acquittal.   Thus the recordings are not "favorable" as contemplated in *Bagley*.  The recordings show that the witnesses were looking for a deal *at that time*, and as it turns out, they did receive benefit on their federal sentences for providing the information that was recorded.  But that all took place almost two years before this trial, and the recordings do not establish that there was an agreement in exchange for testimony *in this trial*.

27.     The recordings are of limited value because they do not refute the fact that there were no agreements in exchange for the witnesses's testimony.  *See Ex Parte Miles*, 359 S.W.3d 647, 666 (Tex. Crim. App. 2012) (citing *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L.Ed.2d 481 (1985); *Agurs*, 427 U.S. at 109-10, 96 S. Ct. 2392; *Hampton*, 86 S.W.3d at 613; *Smith*, 132 S. Ct. at 630–31).

28.     With regard to the recordings, this court finds that [Petitioner] has not provided sufficient facts to support a claim of prosecutorial misconduct, nor has [Petitioner] met the materiality requirement.

29.     Absent additional facts of an agreement or deal between the witnesses Clark and/or Green and the state regarding testifying favorably in order to benefit their federal cases, this court finds that there was no established connection between the federal cases and the witnesses's possible motive to "curry favor" with state authorities by testifying favorably in this case. *See Irby v. State*, 327 S.W.3d 138, 149 (Tex. Crim. App. 2010).

(ECF No. 20-104 at 1-2).

Petitioner fails to show that the state court's rulings were contrary to, or involved an unreasonable application of *Brady* or were an unreasonable determination of the facts based on

the evidence in the record.  Like the state court, this Court finds that the federal plea agreements could arguably be considered favorable and therefore should have been disclosed to defense counsel.  Nevertheless, both of Petitioner's *Brady* claims fail because he has not demonstrated that the evidence in question—the federal plea agreements and undisclosed recordings—were material.  Again, evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  *Bagley*, 473 U.S. at 684.  Thus, Petitioner must establish that the undisclosed plea agreements and recordings "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *LaCaze v. Warden Louisiana Corr. Inst. for Women*, 645 F.3d 728, 737 (5th Cir. 2011) (citing *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).  As discussed in the previous section concerning Petitioner's *Napue/Giglio* claims, however, Petitioner fails to make this showing.  *See* Section III(A)(3), *supra*.  Relief is therefore denied.

## C.   __Trial Counsel__ (Claims 4, 5).

Petitioner's final two allegations contend that his trial counsel rendered ineffective assistance.  Specifically, Petitioner faults counsel for: (1) failing to request a jury instruction on corroboration pursuant to Article 38.075(a) of the Texas Code of Criminal Procedure, and (2) failing to obtain Clark and Green's federal cooperation documentation.  Petitioner raised both allegations during his state habeas proceedings which the TCCA rejected.  As discussed below, Petitioner fails to demonstrate the state habeas court's rejection of these allegations was either contrary to, or an unreasonable application of, Supreme Court precedent.

### 1.   The *Strickland* Standard

The Court reviews Sixth Amendment claims concerning the alleged ineffective assistance of trial counsel (IATC claims) under the familiar two-prong test established in *Strickland v.*

*Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner cannot establish a violation of his Sixth Amendment right to counsel unless he demonstrates (1) counsel's performance was deficient and (2) this deficiency prejudiced his defense.  466 U.S. at 687-88, 690.  According to the Supreme Court, "[s]urmounting *Strickland*'s high bar is never an easy task."  *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

When determining whether counsel performed deficiently, courts "must be highly deferential" to counsel's conduct, and a petitioner must show that counsel's performance fell beyond the bounds of prevailing objective professional standards.  *Strickland,* 466 U.S. at 687-89.  Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Burt v. Titlow*, 571 U.S. 12, 22 (2013) (quoting *Strickland*, 466 U.S. at 690).  To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  Under this prong, the "likelihood of a different result must be substantial, not just conceivable."  *Richter*, 562 U.S. at 112.  A habeas petitioner has the burden of proving both prongs of the *Strickland* test.  *Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

Finally, IATC claims are considered mixed questions of law and fact and are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1).  *See Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010).  Where, as here, the state court adjudicated the IATC claims on the merits, a court must review a petitioner's claims under the "doubly deferential" standards of both *Strickland* and Section 2254(d).  *See Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (citing *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)); *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009).  In such cases, the "pivotal question" is not "whether defense counsel's performance

19

fell below *Strickland*'s standards," but whether "the state court's application of the *Strickland*

standard was unreasonable." *Richter*, 562 U.S at 101.  That is to say, the question to be asked in

this case is not whether counsel's actions were reasonable, but whether "there is any reasonable

argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 105.

      2.    <u>Article 38.075(a)</u> (Claim 4).

In his first IATC claim, Petitioner contends that his trial counsel rendered ineffective

assistance because he failed to request a jury instruction pursuant to Article 38.075(a) of the

Texas Code of Criminal Procedure.  In relevant part, Article 38.075(a) provides:

> A defendant may not be convicted of an offense on the testimony of a person to
> whom the defendant made a statement against the defendant's interest during a
> time when the person was imprisoned or confined in the same correctional facility
> as the defendant unless the testimony is corroborated by other evidence tending to
> connect the defendant with the offense committed.

Because Reginald Green testified to inculpatory statements made by Petitioner while the two

were imprisoned together, Petitioner contends it was error for counsel to not request an

instruction based on Article 38.075(a).  Furthermore, because there is a reasonable possibility

that the only testimony the jury relied on to convict Petitioner was Green's, Petitioner argues he

was prejudiced by counsel's failure to request the instruction.

Petitioner raised this allegation during his state habeas proceedings.  In recommending

the denial of Petitioner's application, the state habeas trial court issued the following findings of

fact and conclusions of law:

> 37.    [Petitioner] failed to object to the lack of an Art. 38.075 jury instruction.
> Unobjected to jury charge errors are reviewed under an egregious harm
> standard of review.  *Almanza v. State***,** 686 S.W.2d 157 (Tex. Crim. App.
> 1985).

> 38.    The corroboration requirement in Article 38.075(a) is similar to the one in
> the accomplice-witness statute, Art. 38.14 ("A conviction cannot be had
> upon the testimony of an accomplice unless corroborated by other
> evidence tending to connect the defendant with the offense committed;

and the corroboration is not sufficient if it merely shows the commission of the offense."). To determine whether an appellant suffered egregious harm from the omission of an accomplice-witness instruction, courts look to the reliability or believability of the corroborating evidence and the strength of its tendency to connect the appellant to the charged offense. *State v. Ambrose*, 487 S.W.3d 587, 598 (Tex. Crim. App. 2016). The corroborative evidence need not be legally sufficient in itself to establish a defendant's guilt. *See Casanova v. State*, 383 S.W.3d 530, 538 (Tex. Crim. App. 2012).

39. In this case, there was evidence presented at trial which corroborated Reginald Green's testimony regarding [Petitioner]'s alleged confession to the murder:

a) Alvin Clark testified to witnessing the shooting.

b) Latoya Clark testified to Alvin Clark's statement to her regarding what he witnessed immediately following the incident.

c) A photo of the bullet entry into [Clark]'s [c]ar from that night was entered into evidence.

d) The owner of the auto shop which repaired the damage to Clark's vehicle from the bullet testified to the date and time of the repair.

e) Donald Grinage testified to witnessing the incident as well.

f) Both Clark and Grinage testified that the shots came from the rear driver's side of a small dark colored black or blue car without tinted windows.

40. This court finds that the totality of the record demonstrates that the State offered credible corroborating evidence, in addition to Green's testimony, which tended to connect [Petitioner] to the charged offense.

41. Even though trial counsel's failure to request an Art. 38.075 instruction was deficient conduct, the failure did not create a reasonable probability that the result of the trial would have been different had counsel asked for an Art. 38.075 instruction. *See, e.g., Davis v. State*, 278 S.W.3d 346 (Tex. Crim. App. 2009); *Ex parte Hatcher*, No. AP-76620, 2011 WL6225406 (Tex. Crim. App. December 14, 2011).

(ECF No. 20-104 at 4). The TCCA then adopted the trial court's findings when it denied relief without written order. (ECF No. 18-19).

21

Petitioner fails to show that the state court's ruling was contrary to, or involved an unreasonable application of *Strickland* or that it was an unreasonable determination of the facts based on the evidence in the record. To start, the Court agrees with both the state habeas court and Petitioner that counsel's failure to request an Article 38.075(a) jury instruction constitutes deficient conduct. Such an instruction is clearly appropriate given that Green testified about Petitioner's statement against interest made while they were imprisoned together. Counsel also admitted his failure to request the instruction was not the result of trial strategy, but rather his being unaware of Article 38.075(a)'s existence.

However, a habeas petitioner must prove both prongs of the *Strickland* test for relief to be warranted. *Wong*, 558 U.S. at 27; *Pondexter v. Quarterman*, 537 F.3d 511, 520 (5th Cir. 2008) (finding that an IATC claim may be rejected for want of either deficient performance or prejudice, and thus the absence of either prong of the *Strickland* analysis is dispositive) (citing *Strickland*, 466 U.S. at 697). Here, Petitioner failed to demonstrate he was harmed by counsel's failure to request an Article 38.075(a) corroboration instruction because, even if he had, there was significant evidence presented at trial which corroborated Green's testimony. This evidence included the testimony of Alvin Clark, who testified to witnessing the shooting, as well as the testimony of Donald Grinage and Lotoya Clark. On the other hand, there is no evidence in the record to support Petitioner's contention that Green's testimony was the only testimony relied on by the jury.

For this reason, Petitioner fails to show that there was a reasonable probability that, but for counsel's failure to request an Article 38.075(a) instruction, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Johnson v. Blackburn*, 778 F.2d 1044, 1050 (5th Cir. 1985) ("If an error is shown to be harmless, then the error cannot satisfy the

prejudice prong of *Strickland*.").    Consequently, viewing this allegation under the "doubly

deferential standard" that applies on federal habeas review, Petitioner has not shown that the

state court's decision was objectively unreasonable or that he is entitled to relief on his IATC

claim.  *Woods*, 136 S. Ct. at 1151.

      3.    <u>The Plea Agreements</u> (Claim 5)

In his last allegation, Petitioner argues trial counsel was ineffective for failing to insist on

the disclosure of Clark and Green's federal cooperation documentation.  According to Petitioner,

counsel's failure to "press on and obtain at least an *in camera* disclosure of the materials"

constituted ineffective assistance that prejudiced him.  (ECF No. 13 at 200).  As with his

previous allegations, Petitioner raised this claim during his state habeas proceedings.    In

recommending the denial of Petitioner's application, the state habeas trial court concluded:

    43.    [Petitioner] also claims in Ground Five that trial counsel was ineffective for failing to obtain the federal plea agreements and plea agreement supplements after being notified of their existence by Neidhardt.  Trial counsel admitted that he did not have federal experience, and he did not have an explanation for why he did not pursue the issue further.  It is true that he could have pushed harder to obtain the actual plea agreements and plea supplements.  It is also true that he could have further attempted to impeach the credibility of the witnesses with regard to the benefits they did receive from providing information to the State regarding this case, and with regard to any hopes of getting a future benefit.

    44.    However, to the extent that trial counsel was deficient for failing to obtain copies of the plea agreements, and/or to the extent that trial counsel was deficient for failing to preserve the *Brady* argument for appeal or otherwise properly object to his inability to further question the witnesses about potential bias, this court finds that the second *Strickland* prong has not been met.  For the same reasons that the trial court found that the federal plea agreement evidence was not material under *Brady*, the trial court finds lack of prejudice under the second prong of *Strickland*.  To establish ineffective assistance of counsel, [Petitioner] must show that there is reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  Had counsel obtained copies of the federal plea agreements and had he been able to explore the terms of such plea agreements on the witness stand with Green and Clark, it is more likely than not, based on their testimony, that they would have

> continued to deny both witnesses had already obtained a benefit in their federal cases from providing information in this case. The trial court finds that there is not a reasonable probability that the witnesses' testimony would have been different, and there is not a reasonable probability that the jury would have viewed their credibility any differently, had defense counsel been successful in further impeachment attempts related to the federal plea agreements. And, preserving the issue on appeal would not likely have resulted in a reversal of the conviction.

(ECF No. 20-104 at 4).

Similar to his previous IATC claim, Petitioner fails to show that the state court's ruling was contrary to, or involved an unreasonable application of *Strickland*. Even assuming, like the state habeas court, that counsel's performance in this case constituted deficient performance, Petitioner still fails to demonstrate that the alleged errors were prejudicial to his defense. *See Pondexter*, 537 F.3d at 520 (finding the absence of either prong of the *Strickland* analysis to be dispositive). Again, to demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "[A] court assessing prejudice must consider the totality of the evidence before the judge or jury." *Mejia v. Davis*, 906 F.3d 307, 315 (5th Cir. 2018) (quoting *Strickland*, 466 U.S. at 696) (internal quotation marks omitted).

As discussed previously, Petitioner failed to demonstrate that Clark's and Green's federal cooperation documentation was material to his conviction—i.e., that there was a reasonable probability that the outcome of his trial would have been different had the evidence been disclosed by the State. *See* Sections III (A) and (B), *supra*. Both witnesses denied having any agreement to testify in Petitioner's case to better their federal cases, and there is no evidence in the record—including the federal plea agreements and supplements—to refute this testimony. Furthermore, the jury in Petitioner's case was already aware Clark and Green had federal convictions. While trial counsel could have questioned these witnesses further about the details

of the agreements, there is no reasonable probability that such impeachment efforts would have affected their credibility in the eyes of the jury, particularly given the other evidence presented by the State and the fact that the plea agreements—entered over a year before Petitioner's trial—never mentioned Petitioner's case.

For the same reasons, Petitioner cannot demonstrate that he was prejudiced by counsel's failure to obtain Clark's and Green's federal cooperation documentation. *See Bagley*, 473 U.S. at 682 (finding the "prejudice" prong of the *Strickland* analysis to be identical to the "materiality" prong of the *Brady* analysis). Petitioner thus fails to demonstrate that the state court's determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Relief is denied.

## IV. <u>Certificate of Appealability</u>

The Court must now determine whether to issue a certificate of appealability (COA). *See* Rule 11(a) of the Rules Governing Section 2254 Proceedings; *Miller–El v. Cockrell,* 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)). A COA may issue only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). If a district court rejects a petitioner's constitutional claims on the merits, the petitioner must demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). This requires a petitioner to show "that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller–El*, 537 U.S. at 336 (citation omitted).

A district court may deny a COA *sua sponte* without requiring further briefing or argument.  *See Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000).  For the reasons set forth above, the Court concludes that jurists of reason would not debate the conclusion that Petitioner was not entitled to federal habeas relief.  As such, a COA will not issue.

## V.  <u>Conclusion and Order</u>

Petitioner has failed to establish that the state court's rejection of the aforementioned claims on the merits during his state habeas proceedings was either (1) contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) based on an unreasonable determination of the facts in light of the evidence presented during Petitioner's state trial, appellate, and habeas corpus proceedings. Accordingly, based on the foregoing reasons, **IT IS HEREBY ORDERED** that:

1.      Federal habeas corpus relief is **DENIED** and Petitioner Latray Whitley's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 2) is **DISMISSED WITH PREJUDICE**;

2.      No Certificate of Appealability shall issue in this case; and

3.      All other motions, if any, are **DENIED**, and this case is now **CLOSED**.

It is so **ORDERED**.

SIGNED this 8th day of February, 2021.


_____
XAVIER  RODRIGUEZ
UNITED STATES DISTRICT JUDGE